Filed 3/25/22  In re A.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re A.B. et al., Persons Coming Under the Juvenile Court Law | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.B., <br><br> Defendant and Appellant. | C091040 <br><br> (Super. Ct. No. STKJVDP20190000218) |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.T. et al., <br><br> Defendants and Appellants; <br><br> A.B. et al., <br><br> Appellants. | C092447 <br><br> (Super. Ct. No. STKJVDP20190000218) |

| | |
|---|---|
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>　　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>R.R.,<br><br>　　　　　Defendant and Appellant. | C092650<br><br>(Super. Ct. No. STKJVDP20190000218) |

These related dependency matters involve claims by various parties challenging the juvenile court's orders removing the two minors from the parents' care and custody, denying placement of the minors with the paternal great-aunt, and extending reunification services to the parents.  (Welf. & Inst. Code, §§ 361, 361.3, 395.)[1]  The final brief was filed in these consolidated cases in June 2021.

In case No. C091040, L.B., father of the minors (father), contends the juvenile court improperly removed the children from their parents' care and denied placement with the paternal great-aunt.  The San Joaquin County Human Services Agency (Agency) counters that there was substantial evidence to support the juvenile court's removal order.  The Agency further argues the parents lack standing to challenge the juvenile court's placement order and, in any event, the juvenile court did not abuse its discretion in denying placement with the paternal great-aunt.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

In consolidated case Nos. C092447 and C092650, the minors' paternal great-aunt Rene (Rene),[2] the minors' mother S.T. (mother), and father all contend the juvenile court abused its discretion when it denied placement of the minors with Rene. The Agency argues the parents lack standing to challenge the juvenile court's placement order and, in any event, the juvenile court did not abuse its discretion in denying placement with Rene. The minors contend the juvenile court erred when it extended additional reunification services to the parents. The Agency agrees and joins in the minors' claim. The parents contend substantial evidence supports the extension of services.

We will affirm the juvenile court's orders.

## BACKGROUND

Father, mother, three-year-old minor Athena B., and 18-month-old minor A.B., came to the attention of the Agency when, on May 22, 2019, the parents took A.B. to the emergency room due to concerns she appeared sleepy and sedated. The parents reported that, in the past, A.B. had slept for long, uninterrupted periods of 28 hours (in December 2018) and 18 hours (in January 2019), and that A.B. was "wobbling" and then "collapsed" with shallow breathing and she "turned blue around the lips." While an initial drug test of A.B. was negative, a subsequent drug test determined the minor was positive for Norfentanyl, a metabolite of Fentanyl. Mother denied having any Fentanyl in the home but stated the paternal grandmother did have some unknown prescriptions. The parents could not explain how the Fentanyl got into the minor's system. The family reportedly had a history of being uncooperative with law enforcement, medical staff, and Child Protective Services (CPS). When staff informed the parents that CPS would be notified, father became uncooperative regarding the minor's treatment. He and mother took the minor from the hospital against medical advice and before they could be served

---

[2] For clarity and to protect privacy, some individuals having the same last name will be referenced by initials, first name, or first name and initial.

with a protective custody warrant. Law enforcement officers located the parents and A.B. in the parents' home the following day. The parents were placed under arrest and served with the protective custody order. Father disclosed that Athena B. was with the maternal grandmother, who produced Athena B. and asked to be evaluated for an emergency relative placement. The social worker obtained the necessary information from the maternal relatives and detained both minors. Subsequent visits to the parents' and the paternal grandmother's homes revealed both homes to be unsuitable for the minors.

A.     *Dependency Petitions*

On May 29, 2019, the Agency filed a dependency petition on behalf of the minors pursuant to section 300, subdivisions (b) and (j), alleging the parents failed to protect the minors based on the May 2019 incident and other circumstances, including a prior similar incident in November 2018 in which A.B. was taken to the Emergency Room with similar symptoms. The juvenile court ordered the minors detained and granted the parents supervised visitation.

The parents adamantly denied having any knowledge of how A.B. was able to ingest Fentanyl and vehemently opposed detention and jurisdiction. Throughout the proceedings, mother attempted to prove she knew nothing about the Fentanyl and to exclude the drug test results from the proceedings. The juvenile court denied her various motions.

On July 30, 2019, the Agency filed an amended petition adding allegations regarding the parents' pattern of failing to follow through on medical care for both minors, placing them at substantial risk of physical harm, and leaving A.B. with an inappropriate caretaker (paternal grandmother).

B.     *Contested Jurisdiction Hearing*

At the contested jurisdiction hearing commencing on August 6, 2019, the juvenile court heard testimony from numerous witnesses, including the parents, the minors'

4

former and current foster parents, expert witnesses, medical professionals, and father's neighbor.

### 1. Past and Current Foster Parents

The minors' former foster parents testified that, while in their care, A.B. did not require any emergency medical care, did not sleep for excessive periods of time, was not lethargic, did not collapse, and did not present with any behavioral issues. The minors' current foster parent testified that when A.B. was in her care, A.B. never had difficulty breathing, respiratory failure, or blueness around the mouth, she never collapsed or lost consciousness, and she never slept for inordinate periods of time or had unusual sleep patterns.

### 2. Dr. Angela Vickers

Dr. Angela Vickers, an expert in child abuse and neglect, testified regarding her medical experience with children who have ingested or been exposed to drugs. Dr. Vickers testified she was familiar with Fentanyl, a synthetic opioid, and the physiological signs and symptoms of Fentanyl ingestion. She explained that Fentanyl did not show up on the minor's initial drug test because hospitals do not test for synthetic opioids. She reviewed photographs taken from the parents' home and the paternal grandmother's home following the May 2019 incident. She noted the homes were unkempt and filled with debris. The debris concerned Dr. Vickers because debris on the floor indicated the caregivers were not cleaning the house on a regular basis which predisposed children under the age of three to pick things up off the ground and, as is normal for children that age, put those things in their mouths. She noted that homes with a lot of debris and a lack of cleanness "tend to have more risk of accidental ingestions in toddlers and young children." She also noted the photographs showed numerous bottles of prescription medication mixed in with debris and accessible to the minors in the paternal grandmother's home. The medications included Percocet, Hydrocodone acetaminophen (Norco), and Oxycodone. The presence of opioids also concerned

Dr. Vickers because, if dropped on the floor and accidentally ingested, the opioids could cause "lethargy, sleepiness and progress to respiratory failure fairly quickly." She noted that Oxycodone, in particular, has a higher potency than Norco and, based on the average weight of a toddler, two adult tablets of Oxycodone could poison a toddler and twice that amount could be lethal. Dr. Vickers testified that A.B.'s symptoms were consistent with accidental ingestion of an opioid and concluded, based on her review of the records from various hospitals, law enforcement, and CPS, that A.B. suffered from ingestion twice.

Dr. Vickers testified that the records indicated the parents emphatically denied there were any opioids or other drug-related substances in their home or the paternal grandmother's home. Mother was asked numerous times whether there were opioids in the home and mother stated there were "absolutely no opioids" in her house and no opioids in the paternal grandmother's house. The fact that the parents left the hospital with the minor against medical advice concerned Dr. Vickers due to the risk of returning the minor to the home where she had previously been poisoned with Fentanyl. Dr. Vickers stated the fact that A.B. had not experienced any similar episodes since being in foster care further substantiated the conclusion that the episode was due to accidental ingestion or poisoning.

*3. Scott Bainbridge*

Scott Bainbridge, an expert in toxicology testing, testified that his test of the drug sample taken from A.B. confirmed the sample was positive for Norfentanyl. He testified that Norfentanyl, a metabolite of Fentanyl, had to be metabolized by the patient and would not produce a positive result from someone handling Fentanyl and then handling A.B.'s urine sample.

*4. Father*

Father testified about prior incidents when he and mother had to take A.B. to the emergency room, including January 2018 when A.B. was hospitalized for a respiratory virus, and November 2018 when A.B. was "very sleepy" but not unconscious. As a

6

result of the November 2018 incident, the minors were removed from the parents' care in January 2019 and returned to the parents in mid-May 2019.

Father testified that, on May 22, 2019, A.B. was in the care of the paternal grandmother while mother was with a friend and father spent the day with Athena B. He picked up A.B. from the paternal grandmother, who reported nothing out of the ordinary. He then picked up mother and, as they headed home, mother told father to pull over because A.B. was "nodding off and kind of laid down into her car seat" and her breathing was irregular. Father stated he and mother assessed the situation and then took A.B. to the nearest hospital (St. Joseph's in Stockton) where hospital staff tended to her. A.B. was then transferred to Sutter Hospital in Sacramento to receive a higher level of care.

Regarding the May 2019 incident, father testified he was unaware he was not supposed to remove A.B. from the hospital and he believed she had been medically cleared with no further treatment needed. He denied being uncooperative with hospital staff after being told CPS would be notified of the minor's positive drug test, or disregarding staff's medical advice against taking the minor home.

Father testified he never bought, used, possessed, or sold Fentanyl and he did not know how A.B. could have tested positive for Norfentanyl. Regarding medications in the home, father testified he had prescriptions for Carisoprodol, Ibuprofen, and Hydrocodone. He kept his medications in bottles with childproof caps in "the highest possible cabinet" in the home. He denied leaving any pills on the counter, and further denied ever having to retrieve something out of the minors' mouths that they had picked up off the floor. Father also denied the home was in poor condition.

5. *Mother*

Mother also testified regarding prior incidents involving A.B., including the January 2018 and November 2018 incidents. Following the first incident, the minor was discharged with documentation reflecting the doctor's advisement to follow up with the minor's primary care physician. Mother testified she never did so.

7

With respect to the November 2018 hospitalization, mother testified she took A.B. to the emergency room because the minor was experiencing respiratory issues. The minor was intubated and then transferred to a hospital in Sacramento. The doctor ran tests on the minor and then released the minor to the parents. Mother did not take A.B. to see her primary care physician after the November 2018 hospitalization.

Regarding the May 2019 hospitalization, mother testified she and father took A.B. to the emergency room, where mother told the doctor that A.B. had been diagnosed with sleep apnea in November 2018. The minor was transferred to Sutter Hospital in Sacramento, where mother spoke briefly with Dr. Samuel Abebe. She denied statements in her previous declaration that she told Dr. Abebe that A.B. was running with her sister until she wobbled and collapsed, A.B. was breathing shallow and mother had to stimulate her to continue breathing, and A.B.'s lips turned blue. She later testified the minor ate an "Otter Pop" that made her lips "bluish purplish."

When shown an intake assessment report written by CPS worker Danielle Bravo, mother did not recall Bravo asking her how Norfentanyl got into A.B.'s system, and she denied telling Bravo the minor "must have gotten it from [the paternal grandmother's] home." She also did not recall father telling Bravo it was not illegal for children to accidentally ingest drugs or refusing to tell Bravo where Athena B. was located. She testified there was "no reason to tell" Bravo where Athena B. was. Mother also denied ever telling anyone at the hospital that A.B. slept for extremely long periods of time or that A.B. had periods of excessive sleepiness. Finally, mother denied ever using Fentanyl and had no idea how A.B. could possibly have tested positive for a metabolite of Fentanyl.

6.     *Adam Kaye, M.D.*

Dr. Adam Kaye testified on behalf of the parents as an expert in pharmacology. Dr. Kaye testified that, when a person tested positive for Norfentanyl, he would expect to see Fentanyl in the system as well. He had never seen a blood test that showed only the

8

metabolite (Norfentanyl) and not the parent drug (Fentanyl). He opined that it was not clear Fentanyl was ever in A.B.'s system. He admitted however that it was possible to test positive for Norfentanyl and not Fentanyl, and he acknowledged that Norfentanyl may be detected in urine for a longer period of time than Fentanyl using the gas chromatography and mass spectrometry method, as was used in A.B.'s case.

> 7.    *Alma Rivas-Leon*

Alma Rivas-Leon, a registered nurse, testified she conducted the urine test on A.B. during the May 2019 hospitalization in order to conduct a toxicology screen. Rivas-Leon explained she attempted to collect A.B.'s urine using a urinalysis bag, but there was not enough urine in the bag so she used a collection method using dry cotton balls, a method common for collecting urine from someone A.B.'s age. She testified that successful urine samples were logged into the medical records; unsuccessful attempts were not. Rivas-Leon testified regarding the procedures she used when collecting urine to avoid contamination, and she confirmed the hospital kept drugs, including Fentanyl, in a locked drawer and access to the drawer was subject to special procedures.

> 8.  *Juvenile court orders*

The juvenile court denied the parents' motion to dismiss and sustained the dependency petition. A second amended petition was subsequently filed to conform to proof.

C.    *Disposition Report and Hearing*

The Agency reported the parents continued to maintain they had no knowledge of how A.B. tested positive for Norfentanyl. The parents wanted the minors returned to their care and the dependency case dismissed, and they refused to make any direct statements to the social worker. A physical exam of Athena B. revealed she had "Autistic behaviors," delayed speech, a heart murmur, and she lacked the proper immunizations. She also demonstrated behavioral issues. The doctor referred Athena B. to Valley Mountain Regional Center (VMRC), an audiologist, and a pediatric

9

cardiologist. However, the parents refused to give their consent for Athena B. to receive those services.

Various relatives were considered for placement of the minors but were found not to be appropriate for various reasons.

The parents continued to pose problems during supervised visitation with the minors, including failing to arrive on time, recording staff against juvenile court orders, arguing with staff members, and not following visitation rules. The Agency considered the parents to be a flight risk given their lack of employment, their transient lifestyle, and their ability to disappear for a month at a time. The parents' unwillingness to cooperate with the Agency, law enforcement agents, and other agencies was noted as worrisome.

The parents' case plan included personal counseling, anger management, substance abuse treatment, parenting education, compliance with juvenile court orders, and compliance with minors' medical treatment, and required them to obtain suitable housing. However, the parents neither engaged in, nor demonstrated any interest in, participating in services. Due to the parents' "steadfast denials of the issues in this case" and their resistance to engage in reunification services, the Agency recommended psychological evaluations to tailor services to the parents' specific issues.

At the contested disposition hearing on August 28, 2019, father presented declarations in support of placement from Jane and Rene. Jane resided in San Jose and was no longer available for placement but was available to transport the minors to visits in Stockton. Rene also lived in San Jose and was available for placement with the assistance of Jane. Rene, who was present in juvenile court, explained that she knew the minors, had spent time with them, and was prepared to have them placed in her home. She stated that her workplace would accommodate her schedule to allow her to work less hours and to leave home later in the morning and drop the minors off at Jane's home on her way to work. Rene stated she and Jane had not yet figured out the logistics of transporting the minors to San Joaquin County during the week for visits with the

10

parents. Rene also stated she lived with her cousin, Olga, in a three-bedroom house. Olga was retired and was in the process of fixing up a house to sell.

The juvenile court issued its tentative placement ruling stating it was not ready to remove the minors from their current placement and place them with new caretakers. The juvenile court noted it did not want to further traumatize the minors by moving them and placing them with Rene, with whom the minors did not have a close enough relationship such that the juvenile court could be assured the minors would feel comfortable. The juvenile court ordered the Agency to investigate Rene to determine if she would be an appropriate placement. The juvenile court also encouraged the Agency to investigate Jane as a possible visitation supervisor and to determine the number of children already in her care and whether that would impact her ability to watch the minors while Rene was at work. Finally, the juvenile court granted the Agency's request for the minors to be assessed at VMRC.

D.    *Supplemental Disposition Report*

The Agency's supplemental disposition report discussed the parents' recent criminal charges related to possession of a stolen vehicle and resisting or obstructing a peace officer. The Agency noted the charges demonstrated "a pattern of behavior/criminal activity" and raised concerns regarding the parents' ability to appropriately manage their anger. The Agency further noted the parents' pattern of behavior would have placed the minors at risk of abuse and neglect and could have resulted in incarceration of both parents, leaving the minors without a caretaker.

E.    *Parents' Motion to Set Aside, Reconsider, or Clarify Jurisdictional Order*

The parents filed a motion to set aside, reconsider, or clarify the juvenile court's August 19, 2019 jurisdictional order. The juvenile court denied the motion explaining it considered the evidence previously presented and, after drawing reasonable conclusions from that evidence, determined A.B. "was in contact with Fentanyl prior to medical intervention."

11

With regard to the Agency's service referrals, and particularly the referral to Drug Court, the juvenile court ordered the parents to drug test immediately to determine whether drug-related services were necessary. The parents refused, at which point their respective attorneys declared conflicts of interest. The juvenile court expressed its concern regarding the parents' refusal to drug test, relieved parents' counsel, and appointed new counsel. The juvenile court again ordered the parents to drug test that day. When they refused a second time, the juvenile court determined their refusal constituted an administrative positive test.

F.     *Trial Setting Hearings*

On September 25, 2019, the foster mother filed a request for de facto parent status. At the trial setting hearing, mother's counsel informed the juvenile court that Rene had received relative family assessment (RFA) approval for placement of the minors. The Agency voiced its concern regarding inconsistent statements previously given by Rene regarding whether her cousin did or did not live in the home with her.

G.     *Contested Disposition Hearing*

1.     *Father*

At the contested disposition hearing, father acknowledged he tested positive for prescription medication, but argued none of those substances were illegal. He testified he had been participating in supervised visitation with the minors since detention five months prior, he and mother had been in stable housing for two months, the home was appropriate for the minors, and he would be willing to have the home assessed by CPS. Father testified he was unemployed but received support from family and friends. He stated he had a safe car he could use to take the minors to and from appointments. Father confirmed he would do anything in his power to protect the minors if the minors were returned to his care. He testified that, if the minors were not returned to his care, he would want the minors placed with the paternal great-aunt, Rene.

12

## 2.    *Mother*

Mother testified she and father rented a home and that their rent had been paid by family and friends for four months. Mother and father were participating in supervised visitation with the minors. Mother testified she was ready and willing to participate in services. She participated in a Drug Court assessment. She acknowledged she tested positive for Hydrocodone, but claimed she obtained a prescription for the medication for a shoulder issue several days prior to the assessment. She failed to report for a random drug test the prior day. Mother acknowledged having been referred to parenting classes, individual counseling, and anger management classes but she and father had yet to engage because they only wanted to participate with providers of their own choosing.

## 3.    *Rene*

Rene testified she was seeking placement of the minors but never contacted the Agency to request visits with them. She testified that, prior to detention, she had seen the minors in "mid-May," "at Christmastime," and for birthdays, holidays, and special occasions. She further testified the agency in Santa Clara County approved her as an emergency placement on September 26, 2019, and she was currently in the process of completing the full RFA process, which would be completed in November 2019. Contrary to her prior testimony, Rene stated that, as of July 1, 2019, she was renting and living alone in a three-bedroom home owned by her cousin, Olga, who did not live in the house. She stated the plan was for Olga to move into the home after she sold her other house, at which point the minors would have to share a bedroom. Rene testified she worked full-time and, while she was at work, the minors would be placed in daycare. If the minors were placed with her, she planned to take six weeks of family paid leave.

It was Rene's opinion that the minors were detained under allegations that were unfounded but nonetheless sustained, and that the minors should be returned to their parents.

*4.       Marisol Enos-Schaffer, Social Worker*

Social worker Marisol Enos-Schaffer testified that mother was referred to random drug testing and to report to New Directions Alcohol & Drug Awareness Program (New Directions) following her Drug Court assessment, but mother did not do those things. Enos-Schaffer referred the parents to services beginning in May 2019, including parenting classes, and she sent e-mails to the parents notifying them of each of the minors' doctor appointments.

*5. Argument and orders*

At the conclusion of witness testimony, the Agency requested that the juvenile court order psychological evaluations in order to tailor services for the parents. The Agency argued, among other things, that it was opposed to placement of the minors with Rene until completion of the full RFA process. Minors' counsel echoed the Agency's concerns and arguments.

Father submitted on disposition and stated he was prepared to actively participate in his case plan, claiming he refused to previously participate on the advice of his prior counsel. Father was also willing to make the family home available to the Agency for inspection. He requested return of the minors to his and mother's care or, alternatively, to the care of Rene. Mother echoed father's arguments and argued she did not need a separate anger management class.

After denying the Agency's request for psychological evaluations, the juvenile court determined it would not return the minors to the parents. It adopted the Agency's recommended findings and orders with the exception of separate anger management for mother.

With regard to placement, the juvenile court declined the parents' request to place the minors with Rene, noting the inconsistencies between Rene's current and prior testimony gave the juvenile court "grave concerns" about what orders Rene would or would not follow. The juvenile court added that while Rene's disagreement with the

14

proceeding was not a reason to deny her placement, it was a factor in the juvenile court's determination regarding whether she would follow the court's orders. The juvenile court ordered supervised visitation for Rene, admonishing her to follow the Agency's visitation rules. The juvenile court granted the parents' request to utilize service providers of their own choosing and to complete all of the necessary tasks associated with doing so within three weeks or be forced to utilize the Agency's service providers.

## H. *Hearing Regarding Services*

On November 14, 2019, the Agency informed the juvenile court that only one of several service providers chosen by the parents had responded to the Agency's inquiry and the parents had yet to provide signed releases of information related to those providers. The Agency further informed the juvenile court that the parents had yet to sign up with New Directions and failed to appear for their random drug test. The juvenile court ordered the parents to drug test that day. Based on the parents' failure to participate in services, the juvenile court denied the parents' request to modify the visitation order. During a break in the hearing, the parents drug tested. Mother tested positive for alcohol and Oxycodone, for which she claimed she had a new prescription. Father tested positive for opioids and Oxycodone, for which he too claimed he had a prescription. The juvenile court ordered the parents to produce any and all prescriptions.

The Agency informed the juvenile court that, during the break, it was able to make contact with one of the parents' chosen individual counseling providers who indicated it was unable to provide services to mother and that it had been attempting to contact mother without success. The juvenile court ordered the Agency to refer mother to one of its designated counseling providers.

## I. *Notices of Appeal - Parents*

On December 11, 2019, mother filed a notice of appeal from the August 15, 2019 ruling on her motion to exclude A.B.'s drug test, the August 19, 2019 jurisdictional orders, the September 18, 2019 motion to set aside, and the October 18, 2019

15

dispositional orders. Father filed a notice of appeal from the October 18, 2019 disposition orders requiring participation in reunification services and exercising jurisdiction over the minors.

*J.      Dependent Review Hearing*

At the December 12, 2019 dependent review hearing, the Agency informed the juvenile court that the parents were discharged from Drug Court on December 9, 2019, due to their failure to enroll in New Directions for random drug testing. The Agency added that the parents failed to provide information regarding their prescriptions as previously ordered, failed to show up for appointments with service providers, and provided false service provider information. The Agency requested a decrease in visits, informing the juvenile court that the minors' service provider reported the minors had been exhibiting more negative behaviors as visits with the parents increased. The Agency also informed the juvenile court that the parents arrived nearly an hour late to Athena B.'s medical appointment and then became irate with staff. The juvenile court ordered the parents to drug test immediately.

Father tested positive for Oxycodone and Cannabis. Mother tested positive for Oxycodone, for which she claimed she had a prescription. Father's counsel confirmed father was not engaged in services. The Agency informed the juvenile court that neither parent was engaged in services and they both continued to provide false information regarding service providers.

The juvenile court expressed concern regarding the parents' lack of participation in services, including Drug Court. After noting that it had given the parents ample time and more than one chance to participate in services with providers of their own choosing, the juvenile court ordered services to be provided by the Agency's service providers and ordered them back into Drug Court. Finally, the juvenile court expressed concern about placing the minors with Rene given her prior conflicting testimony and the juvenile court's lack of confidence that she would follow the court's orders and would allow the

16

parents to visit unsupervised. The juvenile court denied the request to place the minors with Rene and set the matter for a placement hearing.

K.      *Placement Reports, Briefings, and Hearings*

The Agency filed an addendum report stating the minors were experiencing anxious and dysregulated behaviors which had increased as family visits increased. The behaviors were being addressed through mental health services in San Joaquin County and through the care of the foster mother, with whom the minors had been placed for nearly one year. Given that Rene lived in another county, transportation of the minors for visitation would involve excessive amounts of driving time and would limit the amount of time to attend to the minors' mental health treatment and other needs. The Agency noted that Rene's relationship with the minors was limited, she had waited months to request visits or placement despite knowing the minors were in foster care, she did not visit the minors when they were previously removed in January 2019, and she did not have contact with the minors after they were returned to the parents. Rene provided inconsistent testimony regarding whether Olga in fact lived in the home, and she lacked transparency in her statements to the Agency and the juvenile court. Rene did not believe the sustained allegations in the petition, did not think the parents did anything to justify removal of the minors, and did not think the minors would be at risk in the care of the parents, leading the Agency to have doubts as to whether she could provide a safe, secure, and stable home for the minors. The Agency concluded it was not in the best interests of the minors to place them with Rene.

At the contested placement hearing on December 30, 2019, the juvenile court declined to place the minors with Rene, but granted the Agency discretion to arrange and increase supervised visitation between the parents and the minors and between Rene and the minors. The juvenile court also granted the foster mother's request for de facto parent status.

17

The minors indicated they had been in the same foster placement for over a year, they were bonded to their foster parent, and they had developed a routine which included a familiarity with friends at daycare, service providers who saw them in the home, the home itself, and the visitation center.

*L.    Review Report*

The Agency's June 2020 report stated multiple attempts to meet with the parents to discuss their case plans were unsuccessful because the parents refused to make themselves available.  The parents had only recently started to participate in services.  Mother completed less than half of her individual counseling sessions.  Father completed only two of 20 individual counseling sessions.  Father eventually enrolled in an anger management program, but he refused to participate in group and indicated he did not have any anger issues and was thereafter terminated due to excessive absences.  Both parents completed parenting classes, but there were concerns about whether they understood how to apply the parenting strategies.  Both parents continued to deny the reasons for removal of the minors.  Mother produced positive tests for Oxycodone, opiates, and alcohol.  Father tested positive for opiates, THC (the active ingredient in marijuana), and Oxycodone.  The parents' reinstatement to Drug Court was eventually vacated by the juvenile court.  The Agency recommended that the juvenile court terminate reunification services to the parents.

*M.    Placement Hearing*

At the July 24, 2020 review hearing, the Agency and the minors requested that the juvenile court deny Rene's request for placement, arguing Rene did not have a close relationship with the minors prior to the dependency proceedings and, on the other hand, the minors had a close bond with their foster mother, who had been caring for them for 14 months.  The Agency and the minors further argued that changing the minors' placement was not in their best interests and expressed concern about Rene's ability to facilitate visitation with the parents and protect the minors and about the fact that she

18

lived in Santa Clara County. The parents argued the minors should be placed with Rene, who was prepared to provide permanency and had met all of the requirements of section 361.3. After applying the factors set forth in section 361.3, the juvenile court denied Rene's request for placement.

*N.     Rene's Section 388 Petition*

Rene filed a section 388 petition requesting the juvenile court change its October 18, 2019 order and place the minors in her care and custody. She argued she successfully completed the RFA classes and had been fully foster care approved for seven months, including that her housing was appropriate, she was financially stable, the county where she lived had confirmed it could provide services to the minors, and she had consistently attended weekly visits with the minors. The Agency opposed Rene's petition, arguing there was no evidence of changed circumstances and the requested change was not in the minors' best interests. On August 3, 2020, the juvenile court denied Rene's section 388 petition without a hearing.

*O.     Notices of Appeal – Rene, Mother, and Father*

Rene, mother, and father each filed notices of appeal from the juvenile court's July 24, 2020 order denying Rene's request for placement of the minors.

*P.     Contested Dependent Review Hearing*

The contested dependent review hearing was completed on July 31, 2020. The Agency detailed the parents' progress in case plan services. It noted both parents were terminated from Drug Court, then reinstated, then terminated again due to failure to participate. The parents completed parenting classes. Mother completed a portion of her individual counseling sessions. Father completed half of his individual counseling sessions and one session of anger management before he was terminated due to excessive absences. He enrolled with a new counselor and had completed eight of 16 sessions.

Father testified he was trying to reunify with the minors and, if the juvenile court ordered additional reunification services, he would continue to move towards completion

19

of those services. He testified he did not need an anger management program because he could control his anger. He continued to deny any wrongdoing with respect to the removal of the minors.

The juvenile court reiterated its denial of Rene's section 388 petition regarding placement. It also ordered that the minors remain in their current placement and that six additional months of services be provided to the parents.

*Q.     Notice of Appeal – Minors*

On August 10, 2020, the minors filed a notice of appeal from the juvenile court's July 31, 2020 order granting the parents six months of additional reunification services.

DISCUSSION

I

*Removal*

Father contends the juvenile court improperly removed the minors from their parents' care because there were reasonable means to prevent removal.

To support an order removing a child from parental custody, the court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see *In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) Removal findings are reviewed under the substantial evidence test, drawing all reasonable inferences to support the findings and noting that issues of credibility are matters for the juvenile court. (*In re Heather A.,* at p. 193.)

20

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.W., supra*, 214 Cal.App.4th at p. 1163.)

Father argues there was no evidence the parents ever intentionally did anything to harm the minors or place them at risk. He also argues any concerns stated by the juvenile court as reasons for removal could have been addressed while the minors were in the parents' care. But as recounted at length above, there is substantial evidence of the parents' inability to provide proper care for the minors and potential detriment to the minors if they remained in the parents' custody. Similarly, there is sufficient evidence to support the finding of no reasonable means to prevent removal. Sufficient evidence supports the juvenile court's removal order.

## II

### *Placement*

The parents and Rene contend the juvenile court abused its discretion when it denied placement of the minors with Rene. Mother claims the juvenile court failed to follow the requirements set forth in section 361.3 and failed to act in the minors' best interests. Father joins and adopts mother's claims and further argues the juvenile court erred in failing to place the minors with Rene, who was a fit and willing relative and who had been approved for emergency placement. Rene claims the Agency conducted an incomplete RFA assessment and the juvenile court erred when it found placement with Rene was not appropriate. The Agency argues the parents lack standing to challenge the juvenile court's placement order and, in any event, the juvenile court did not abuse its discretion in denying placement with Rene.

Standing to raise a particular issue on appeal depends on whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v.*

*Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035; accord *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) A person does not have standing to urge errors on appeal that affect only the interests of others. (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877.) Accordingly, a parent is precluded from raising issues on appeal that do not affect his or her own rights. (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806.)

In dependency proceedings, a parent's interest is in reunification and in maintaining a parent-child relationship. (See *In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541.) While reunification efforts are ongoing, parents generally have standing on appeal to raise issues concerning relative placement. (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493.)

Assuming, without deciding, the parents' rights were injuriously affected by the placement order, we turn to the propriety of the placement order. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) In determining where to place a child removed from the physical custody of his or her parents, preferential consideration is given to relatives. (§ 361.3, subd. (a).) A "relative" is defined as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship." (§ 361.3, subd. (c)(2); see also § 319, subd. (h)(2).) " 'Section 361.3 gives "preferential consideration" to a relative's request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).)' [Citation.] 'When considering whether to place the child with a relative, the juvenile court must apply the [section 361.3] placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement.' [Citation.]" (*In re A.K.* (2017) 12 Cal.App.5th 492, 498; accord *In re Isabella G.* (2016) 246 Cal.App.4th 708, 719.) Placement with a relative is neither required nor guaranteed. (§ 16519.5, subd. (c)(6).)

22

We review a juvenile court's determination regarding relative placement pursuant to section 361.3 for abuse of discretion. (*In re Robert L., supra*, 21 Cal.App.4th 1057, 1067.) "[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling." (*Ibid.*) "Broad deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citations.]' [Citation.]" (*Ibid.*)

Mother argues the juvenile court failed to consider each of the factors set forth in section 361.3, subdivision (a). We disagree. Section 361.3, subdivision (a) requires consideration of each of the following eight placement factors: (1) the best interest of the child; (2) the wishes of the parent, the relative, and the child, if appropriate; (3) the provisions set forth in Family Code section 7950, et seq., regarding relative placement; (4) placement of siblings in the same home . . . ; (5) the good moral character of the relative and any other adult living in the home, "including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect"; (6) the nature and duration of the relationship between the child and relative, and the relative's desire to care for and provide legal permanency for the child if reunification is unsuccessful; (7) the ability of the relative to provide a safe, secure, and stable environment for the child, exercise proper and effective care and control of the child, provide a home and the necessities of life for the child, protect the child from his or her parents, facilitate court-ordered reunification efforts with the parents, facilitate visitation with the child's other relatives, facilitate implementation of all elements of the case plan, provide legal permanence for the child if reunification fails, and arrange for appropriate and safe child care if necessary; and (8) the safety of the relative's home. (§ 361.3, subd. (a)(1)-(8); see *In re Luke L.* (1996) 44 Cal.App.4th 670, 680; *Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 111.)

The record makes plain that the juvenile court considered the section 361.3 factors and found the factors in favor of placing the minors with Rene were outweighed by several key factors against placement. The juvenile court stated that, while Rene was entitled to preference due to the fact that she was a blood relative of the minors, that preference was not absolute and was subject to an assessment of the minors' best interests, including their physical, psychological, educational, medical, and emotional needs, all of which were being addressed by the foster parent. The juvenile court noted that Rene had previously not been clear in testifying about who was living in her Santa Clara County home, calling into question Rene's ability to provide a safe, secure, and stable environment for the minors as well as the moral character of another adult who might soon be living in the home. Based on Rene's own testimony, the juvenile court found Rene's relationship with the minors prior to detention was "de minimis at best." The juvenile court stated that, while Rene's desire to care for the minors was commendable, she did not seek placement until well after detention, raising an issue as to the degree to which Rene was willing and able to provide permanency in the event reunification failed. The juvenile court also took into consideration Rene's belief that the allegations regarding the parents were false and the minors should never have been removed, raising concerns regarding whether Rene would appropriately protect the minors from their parents. In addition, the juvenile court found that removing the minors from their current placement at that point in time was not in their best interests. The juvenile court's findings were supported by sufficient evidence.

Acknowledging, correctly, that the juvenile court had discretion to consider the bond between the minors and the foster parent, mother argues the juvenile court placed too much weight on that bond and gave no weight to relative placement. But the record establishes the juvenile court weighed all the factors set forth in section 361.3, subdivision (a). We do not reweigh the evidence, and there is no abuse of discretion.

We also reject Rene's claim that the Agency failed to conduct a full and complete assessment of her, and the juvenile court failed to order the Agency to do so before undertaking its own independent assessment. In support of her claim, Rene refers to the December 20, 2019 notice she received from the Agency informing her that the minors would not be placed in her home. Attached to that notice was a document, which Rene refers to as the Agency's "assessment report," explaining the reasons for the Agency's decision, that is, those provisions of section 361.3, subdivision (a) that supported the Agency's decision not to place the minors with Rene. The document is not a report, nor does it state that the Agency undertook to assess only those provisions listed when considering Rene for placement pursuant to section 361.3.

The juvenile court's denial of placement with Rene was not arbitrary, capricious, or patently absurd. (*In re Stephanie M., supra*, 7 Cal.4th at p. 318.) The fact that evidence could be viewed more favorably to the proposed placement does not justify overturning the juvenile court's order. (*Id.* at p. 319.)

III

*Reunification Services*

The minors contend the juvenile court erred in ordering six months of additional reunification services to the parents at the 12-month review hearing. The Agency agrees. The parents argue the order is supported by substantial evidence.

Reunification services for a child who, on the date of initial removal from the physical custody of the parent or guardian, was under three years of age, shall be provided for a period no longer than 12 months from the date the child entered foster care (§ 361.5, subd. (a)(1)(B)), except that reunification services may be extended up to 18 months if the permanent plan is that the child will be returned and safely maintained in the home within the extended time period. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1); *San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 222.)

25

Although we might have reached a different decision on extension of reunification services, we cannot say there was no substantial evidence to support the juvenile court's decision to extend services. The record indicates the parents consistently and regularly visited with the minors. Parents had a new home and rent was being paid. They both expressed a desire to participate in services and father said he would make the home available to the Agency. The parents completed parenting classes, and they had completed some of their other sessions. Under the circumstances, we decline to reverse the juvenile court's order.[3]

DISPOSITION

The juvenile court's orders are affirmed.


_____/S/_____
MAURO, Acting P. J.


We concur:


_____/S/_____
HOCH, J.


_____/S/_____
KRAUSE, J.

---

[3] We granted father's request for judicial notice of the juvenile court's December 10, 2021 minute order, which provided, among other things, that the minors be placed in the home of the parents on or before December 13, 2021.